**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| 30 E Broad St., 17th Floor | ) | No. _____ |
| Columbus, OH 43215; | ) | COMPLAINT FOR INJUNCTIVE |
| | ) | AND DECLARATORY RELIEF |
| STATE OF WEST VIRGINIA | ) | AND PETITION FOR REVIEW |
| State Capitol Building 1, Room E-26 | ) | |
| Charleston, WV 25305; | ) | |
| | ) | |
| STATE OF ALABAMA | ) | |
| 501 Washington Avenue, | ) | |
| Montgomery, AL 36130; | ) | |
| | ) | |
| STATE OF ALASKA | ) | |
| 1031 West 4th Avenue, Suite 200 | ) | |
| Anchorage, AK 99501; | ) | |
| | ) | |
| STATE OF ARKANSAS | ) | |
| 323 Center Street, Suite 200 | ) | |
| Little Rock, AR 72201; | ) | |
| | ) | |
| STATE OF COLORADO | ) | |
| 1300 Broadway | ) | |
| 10th Floor | ) | |
| Denver, CO 80203; | ) | |
| | ) | |
| STATE OF INDIANA | ) | |
| 302 West Washington Street | ) | |
| Indiana Government Center South, Fifth Floor | ) | |
| Indianapolis, IN 46204; | ) | |
| | ) | |
| COMMONWEALTH OF KENTUCKY | ) | |
| 700 Capitol Avenue, Suite 118 | ) | |
| Frankfort, KY 40601; | ) | |
| | ) | |
| KENTUCKY ENERGY AND | ) | |
| ENVIRONMENT CABINET | ) | |
| Charles Snavely, Secretary | ) | |
| 300 Sower Blvd., 3rd Floor | ) | |
| Frankfort, KY 40601; | ) | |

STATE OF MISSOURI                                   )
207 W. High Street                                  )
P.O. Box 899                                        )
Jefferson City, MO 65102;                           )
                                                    )
STATE OF MONTANA                                    )
215 North Sanders                                   )
Post Office Box 201401                              )
Helena, MT 59620-1401;                              )
                                                    )
STATE OF TEXAS                                      )
P.O. Box 12548 (MC 059)                             )
Austin, TX 78711-2548;                              )
                                                    )
STATE OF UTAH                                       )
350 North State Street, #230                        )
P.O. Box 142320                                     )
Salt Lake City, UT 84114-2320;                      )
                                                    )
STATE OF WYOMING                                    )
2320 Capitol Ave.                                   )
Cheyenne, WY 82002                                  )
                                                    )
                        *Plaintiffs*,               )
                                                    )
v.                                                  )
                                                    )
UNITED STATES DEPARTMENT                            )
OF THE INTERIOR;                                    )
and SALLY JEWELL, in her official capacity as       )
Secretary, United States Department of the Interior, )
1849 C Street, NW                                   )
Washington, D.C. 20240;                             )
                                                    )
OFFICE OF SURFACE MINING                            )
RECLAMATION AND ENFORCEMENT;                        )
and JOSEPH PIZARCHIK, in his official capacity      )
as Director, Office of Surface Mining Reclamation   )
and Enforcement                                     )
1951 Constitution Avenue NW                         )
Washington, D.C. 20240;                             )
                                                    )
                        *Defendants*.               )

## COMPLAINT

1.      The States of Ohio, West Virginia, Alabama, Alaska, Arkansas, Colorado, Indiana, Missouri, Montana, Texas, Utah, and Wyoming, the Commonwealth of Kentucky, and the Kentucky Energy and Environment Cabinet petition for review and injunction of a final rule titled the "Stream Protection Rule" promulgated by the Office of Surface Mining Reclamation and Enforcement ("Office of Surface Mining" or "Office").  *See* Stream Protection Rule, 81 Fed. Reg. 93,066 (December 20, 2016) ("the Final Rule" or "Rule").

2.      This Rule fundamentally and impermissibly rewrites the Surface Mining Control and Reclamation Act ("Surface Mining Act" or "Act") by substituting a mandatory federal top-down, one-size-fits all rule for what the Act designates as primarily the States' responsibility in regulating coal mining and reclamation operations based on local conditions and state experience.  The Rule imposes heavy burdens on the States and the coal industry, and it will end or significantly impair the development of coal resources.  Despite the sweeping nature of this Rule and the objections raised by many States, and contrary to specific congressional mandates that the federal agency confer with interested States, the Office of Surface Mining adopted the Rule without providing for meaningful participation by the States.  The Final Rule exceeds the agency's statutory authority under the Surface Mining Act and is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  The agency's assertion of authority should be vacated and enjoined because it violates the Surface Mining Act, the Administrative Procedure Act, the National Environmental Policy Act, the Consolidated Appropriations Act of 2016, and the U.S. Constitution.  Accordingly, the States ask the Court to enjoin and vacate the Rule, declare it unlawful, and grant such other relief as may be appropriate.

3.      When enacting the Surface Mining Act, 30 U.S.C. §§ 1201-1328, Congress recognized that "because of the diversity in terrain, climate, biologic, chemical, and other

physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States." 30 U.S.C. § 1201(f). Perhaps more so than other environment statutes, therefore, the Surface Mining Act "exhibits extraordinary deference to the States." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293-94 (4th Cir. 2001).

4.      Congress also found it "essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry" because "the overwhelming percentage of the Nation's coal reserves can only be extracted by underground mining methods." 30 U.S.C. § 1201(b). Congress also recognized the importance of extracting coal from surface mines. *See id.* § 1201(a)-(b). It thus designed the Act to "strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy." *Id.* § 1202(f).

5.      The States of Ohio, West Virginia, Alabama, Alaska, Arkansas, Colorado, Indiana, Missouri, Montana, Texas, Utah, and Wyoming, the Commonwealth of Kentucky, and the Kentucky Energy and Environment Cabinet take seriously their right and duty as the regulators of the lands within their borders to protect the environment and allow for an economically healthy coal industry providing jobs and energy to their citizens.

6.      The Rule is an unprecedented and overreaching effort by the Office of Surface Mining to end coal mining and to displace the States as the primary regulator of that practice. Rather than recognize the States' primary responsibility of regulating coal mining within their boundaries in accordance with their own unique conditions, the Final Rule seeks to require States to adopt and implement specific regulations governing a stream buffer zone, revegetation,

2

restoration, fish and wildlife protections, bonding, and water quality standards in violation of the Surface Mining Act.

7.      The Rule's expansion of federal authority over the States' core sovereign decisions regarding intrastate water and land-use management in connection with mining operations would exceed Congress's enumerated powers under the U.S. Constitution, as evidenced by the States' retention of sovereign authority under the Tenth Amendment.

8.      Furthermore, the Office of Surface Mining promulgated the Rule without properly consulting with the States, as required by regulations under the National Environmental Policy Act.   *See* 40 C.F.R. §§ 1501.6, 1508.5.   Not only that, the Office disregarded explicit congressional instruction made in an explanatory statement incorporated by reference into the Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 4, 129 Stat. 2242, 2244 (2015), requiring the Office to provide the States with all background material collected or produced with regard to the then-contemplated Rule and to meaningfully reengage States in the drafting process by meeting with any primacy State at its request.   *See* 161 Cong. Rec. H10161-01, H10,217 (daily ed. Dec. 17, 2015) (explanatory statement).   In addition, former Secretary of the Interior Ken Salazar committed to the States that a draft of the final rule would be provided to the States prior to the public release of the final rule.   Despite requests from States and Secretary Salazar's commitment, the Rule issued without opportunity for such informed collaboration.

9.      The Office of Surface Mining's failure to consult with the States deprived them of the opportunity to assist in drafting the Rule and to provide their perspectives as the primary regulatory authorities.   In addition, the Office's unlawful attempt to expand its authority over the regulation of coal mining in excess of the authority of the Surface Mining Act imposes great

burdens on the States and their citizens.  The Rule eliminates State discretion in regulating coal mining consistent with local needs and circumstances.  It also requires States to implement rules and regulations that are inconsistent with the Act.  The Rule effectively makes mining impossible in vast areas of the country, despite the fact that coal is one of the nation's base fuel supplies for electric power generation, further harming the States and their citizens.

## THE PARTIES

10.     Plaintiffs—Ohio, West Virginia, Alabama, Alaska, Arkansas, Colorado, Indiana, Kentucky, Missouri, Montana, Texas, Utah, and Wyoming—are sovereign States that regulate land-use management and water resources within their borders through duly enacted state laws administered by state officials and constituent agencies.  In addition, Ohio, West Virginia, Alabama, Alaska, Arkansas, Colorado, Indiana, Kentucky, Missouri, Montana, Texas, and Wyoming are primacy States that have assumed exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within their borders under the Surface Mining Act.  *See* 30 U.S.C. § 1253; 30 C.F.R. §§ 935.10 (Ohio); 948.10 (West Virginia); 901.10 (Alabama); 902.10 (Alaska); 904.10 (Arkansas); 906.10 (Colorado); 914.10 (Indiana); 917.10 (Kentucky); 925.10 (Missouri); 926.10 (Montana); 943.10 (Texas); 944.10 (Utah); 950.10 (Wyoming).  Plaintiff, Kentucky Energy and Environment Cabinet, is the agency of the Commonwealth of Kentucky that administers and enforces the program for regulation of surface coal mining and reclamation operations within Kentucky under the Surface Mining Act as well as other environmental laws and regulations.  Accordingly, reference to the Commonwealth of Kentucky in this complaint includes the Kentucky Energy and Environment Cabinet.

11.     Defendant Sally Jewell (in her official capacity) is the Secretary of the United States Department of the Interior.  Defendant the Department of Interior is an agency of the United States within the meaning of the Administrative Procedure Act ("APA").  *See* 5 U.S.C.

§ 551(1).  The Secretary and the Department of Interior are charged at the federal level with administering many provisions of the Surface Mining Act, through the Office of Surface Mining.

12.     Defendant Joseph Pizarchik (in his official capacity) is the Director of the Office of Surface Mining, an office within the Department of the Interior.  Defendant the Office of Surface Mining is an agency of the United States within the meaning of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 551(1).  The Director and the Office are charged at the federal level with administering provisions of the Surface Mining Act.

13.     The relief requested in this action is sought against the Defendants, the Defendants' officers, employees, and agents, and all persons acting in cooperation with the Defendants or under the Defendants' supervision, direction, or control.

## JURISDICTION AND VENUE

14.     This case arises under the APA, 5 U.S.C. §§ 701-706, the Surface Mining Act, 30 U.S.C. §§ 1201-1328, the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 4, 129 Stat. 2242, 2244 (2015), and the U.S. Constitution.

15.     This Court has federal question jurisdiction under 28 U.S.C. § 1331.  It has the authority to review the Rule under 30 U.S.C. § 1276.

16.     The Court may award declaratory and injunctive relief under the APA, 5 U.S.C. §§ 705-706, as well as under 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.  Further, 30 U.S.C. § 1276(c) and (d) authorize this Court to order temporary relief from the Rule and to stay its operation.

17.     Venue is proper in this Court under 30 U.S.C. § 1276(a)(1) because this case concerns an "action by the Secretary promulgating national rules or regulations including standards pursuant to sections 1251, 1265, 1266, [or] 1273 of [title 30]."

5

## FACTUAL ALLEGATIONS

I.  **The Surface Mining Act establishes a regulatory regime built on deference to the States and on a delicate balance between protecting the environment and ensuring a vibrant coal industry.**

18.     Congress enacted the Surface Mining Act in 1977.  30 U.S.C. §§ 1201-1328.  It designed the Act to serve two central purposes.  The Act expressly "strike[s] a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy."  30 U.S.C. § 1202(f).  On the one hand, Congress sought to "protect society and the environment from the adverse effects of surface coal mining operations."  *Id.* § 1202(a).  Just as importantly, however, Congress sought to "assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being [was] provided."  *Id.* § 1202(f).  Several aspects of this compromise are relevant here.

19.     *First*, the Surface Mining Act "exhibits extraordinary deference to the States." *Bragg*, 248 F.3d at 293.  In keeping with Congress's determination that "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to [the Act] should rest with the States," 30 U.S.C. § 1201(f), the Act provides that the States may obtain primary jurisdiction over surface coal mining and reclamation on their lands through a regulatory program approved by the Office of Surface Mining.  30 U.S.C. § 1253.

20.     To obtain primacy, a State must propose a regulatory program showing that it has, among other things: (1) "a State law which provides for the regulation of surface coal mining and reclamation operations in accordance with [the Act]"; (2) "a State law which provides sanctions for violations of State laws, regulations, or conditions of permits"; (3) "a State regulatory authority with sufficient administrative and technical personnel"; (4) "a State law which provides

6

for the effective implementations, maintenance, and enforcement of a permit system"; (5) "a process for coordinating the review and issuance of permits for surface coal mining and reclamation operations with any other Federal or State permit process applicable to the proposed operations"; and (6) "rules and regulations consistent with regulations issued by the Secretary pursuant to [the Act]." *Id.* § 1253(a).  The Secretary must then approve the state program.  *Id.* § 1253(b).

21.    Ohio, West Virginia, Alabama, Alaska, Arkansas, Colorado, Indiana, Kentucky, Missouri, Montana, Texas, Utah, and Wyoming have long had approved programs.  They are thus "primacy" States under the Surface Mining Act because each maintains approved State programs.  *See* 30 C.F.R. §§ 935.10 (Ohio); 948.10 (West Virginia); 901.10 (Alabama); 902.10 (Alaska); 904.10 (Arkansas); 906.10 (Colorado); 914.10 (Indiana); 917.10 (Kentucky); 925.10 (Missouri); 926.10 (Montana); 943.10 (Texas); 944.10 (Utah); 950.10 (Wyoming).

22.    Once a State has an approved program, "the state has the primary responsibility for achieving the purposes of the Act."  *In re Permanent Surface Min. Regulation Litig.*, 653 F.2d 514, 519 (D.C. Cir. 1981).  The State becomes the sole issuer of permits with authority to determine who will mine in what area and subject to what conditions.  30 U.S.C. §§ 1253, 1271. To approve a permit, the State must find that the proposed mining operations, among other things, have "been designed to prevent material damage to hydrologic balance outside the permit area."  *Id.* § 1260(b)(3).  The permit must require that the mining operations meet the Act's "applicable performance standards," along with any other standards that the "regulatory authority"—i.e., the State—might require.   *Id.* § 1265(a).   The State also bears primary responsibility to enforce any permit conditions.  *Id.* § 1271(a)(1).

23.     Notably, then, it is the primacy State—and not the federal government—that serves as the "regulatory authority" for its approved State programs under the Act. Underscoring this crucial feature, the Act explicitly defines "regulatory authority" to mean "the State regulatory authority where the State is administering this chapter under an approved State program . . . ." *Id.* § 1291(22).

24.     Thus, for but a few of many examples, it is the "regulatory authority"—the primacy State—that "shall grant, require modification of, or deny" a mining permit application under 30 U.S.C. § 1260(a); it is the "regulatory authority"—a primacy State—that is to assess "the probable cumulative impact of all anticipated mining in the area on the hydrologic balance" as specified in the Act under 30 U.S.C. § 1260(b)(3); and it is the "regulatory authority"—a primacy State—that shall specify procedures to "permit surface mining operations" consistent with statutory purposes and constraints and that "shall promulgate specific regulations to govern the granting of permits . . . [and that] may impose such additional requirements as [it] deems to be necessary" under 30 U.S.C. § 1265(c)(1) and (5).

25.     States have unique geographic, geologic, biologic, and climatic features that are not recognized in the Rule, the Regulatory Impact Analysis, or the Environmental Impact Statement. The uniqueness of Alaska, for example, was specifically recognized by Congress in 30 U.S.C. § 1298, which mandated that the Secretary of the Interior conduct an "in-depth study of surface coal mining conditions in the State of Alaska in order to determine which, if any, of the provisions of this chapter should be modified with respect to surface coal mining operations in Alaska."

26.     *Second*, given the goal not to permit costly and unnecessary overregulation of coal mining, 30 U.S.C. § 1202(f), Congress intended that the Act not inefficiently duplicate,

8

amend, displace, or otherwise undermine other environmental statutes, and those statutes that vest enforcement authority elsewhere do not somehow magnify the power of the Office of Surface Mining as constrained by the Surface Mining Act.  Specifically, for example, the Act states that "[n]othing in this chapter shall be construed as superseding, amending, modifying, or repealing . . . The Federal Water Pollution Control Act [("Clean Water Act")], the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality."  30 U.S.C. § 1292(a).  Thus, "where the Secretary's regulation of surface coal mining's hydrologic impact overlaps EPA's, the Act expressly directs that the [Clean Water Act] and its regulatory framework are to control."  *In re Surface Min. Regulation Litig.*, 627 F.2d 1346, 1367 (D.C. Cir. 1980).  Indeed, the Office itself previously recognized that it should not "attempt[] to introduce Clean Water Act terminology and procedures into regulations implementing" the Surface Mining Act, and instead should "adopt terminology and requirements based on" the actual provisions of that Act.  *See* 73 Fed. Reg. 75,814, 75,829 (Dec. 12, 2008).

27.     *Third*, with the Surface Mining Act, Congress found that "the overwhelming percentage of the Nation's coal reserves can only be extracted by underground mining methods, and it [was], therefore, essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry."  30 U.S.C. § 1201(b).  Congress thus designed the Act to "encourage the full utilization of coal resources through the development and application of underground extraction technologies," *id.* § 1202(k), and specifically envisioned that mining technology may "require[] planned subsidence in a predictable and controlled manner," *id.* § 1266(b)(1).  Moreover, the Act instructs the Office to "consider the distinct difference between surface coal mining and underground coal mining" when adopting regulations.  *Id.* § 1266(a).  And Congress recognized the importance of surface

9

mining in addition to underground mining, in assuring that the coal supply essential to the Nation's energy needs would be met.  *Id.* § 1201(a)-(b); *id.* § 1202(f).  Thus, for example, Congress required the regulatory authority to develop general performance standards to protect the environment while not effectively prohibiting surface mining operations.  *See, e.g.*, *id.* § 1265(b)(24) (requiring that operators, "to the extent possible using the best technology currently available, minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values, and achieve enhancement of such resources where practicable").

**II.     Between 1979 and 2008, the Office of Surface Mining adopted three versions of a so-called "Stream Buffer Rule."**

28.     An early version of what eventually became the Surface Mining Act "included a flat prohibition on mining within 100 feet of" certain water bodies.  73 Fed. Reg. at 75,816.  The Act itself, however, ultimately discarded this provision.  *See* 30 U.S.C. § 1272(e) (identifying areas where mining should not occur, but not including land near water bodies).

29.     Even though the Surface Mining Act contains no prohibition barring mining around streams, the Office of Surface Mining has attempted to promulgate three different sets of regulations limiting coal mining near streams.

30.     In 1979, the Office published a "Stream Buffer Rule" that prohibited surface mining operations from disturbing the surface area within 100 feet of a perennial stream or a non-perennial stream "with a biological community" (defined as a stream including certain species).  Yet this rule permitted a State to allow that disruption if it found both that the original stream channel would be restored and that the operations would not adversely affect the quantity and quality of the stream segment.  30 C.F.R. §§ 816.57, 817.57 (1979); 44 Fed. Reg. 14902, 15176 (Mar. 13, 1979).  The rule also excluded from this general prohibition the practice of

diverting streams, thereby allowing for mining along the former streambed so long as that diversion comported with diversion regulations. *See* 30 C.F.R. § 817.57(a) (1979). The Office viewed this 100-foot buffer as a "simple rule for enforcement purposes," but clarified that "site-specific variations should be made available when the regulatory authority has an objective basis for either increasing or decreasing the width of the buffer zone." 44 Fed. Reg. at 15,176-77.

31.    In 1983, the Office revised the Stream Buffer Rule by removing the requirement that the coal-mining operation restore the original stream channel. The revised rule generally prohibited disturbing land within 100 feet of a perennial or intermittent stream. It again, however, allowed a State to authorize mining activities within that zone if it found that the activities would not cause or contribute to a violation of applicable water quality standards under the Clean Water Act and would not adversely affect water quantity and quality or other environmental resources of the stream. *See* 48 Fed. Reg. 30,312, 30,327-28 (Jun. 30, 1983).

32.    In 2008, the Office of Surface Mining again revised the Stream Buffer Rule. This time, the Office conceded that the Surface Mining Act's plain terms do "not establish or require a buffer zone for streams or other waters." 73 Fed. Reg. at 75,816. The Office thus changed the rule to make it "better conform[] to the underlying provisions of" the Act. *Id.* at 75,855. Most notably, the rule eliminated the regulatory agency's required finding that the proposed activity would not cause or contribute to a violation of water quality standards. Instead, the rule required only that mine operators minimize disturbance of perennial or intermittent streams and land within 100 feet of those streams to the extent reasonably possible. *Id.* at 75,877. The Office decided to remove the water-quality-standards requirement "because [that] language more closely resembles the Clean Water Act than the" Surface Mining Act. *Id.* at 75,819.

11

33.     The 2008 rule was challenged in court.  This Court ultimately vacated the rule on *procedural* grounds because the Office of Surface Mining failed to consult with required entities (in that case, the federal wildlife agencies rather than the States).  *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7 (D.D.C. 2014).  This Court did not, however, invalidate or otherwise question the Office's legal reasoning concerning the Stream Buffer Rule or the distinction between the Clean Water Act and the Surface Mining Act.

34.     The 1983 Stream Buffer Rule thus remains currently in effect.

**III.    In 2015, after shunning the States' participation in its process, the Office of Surface Mining proposed a comprehensive rule revising the Stream Buffer Zone and adding a wide variety of other regulatory requirements relating to the mining process.**

**A.      The Office of Surface Mining shunned the States' participation.**

35.     The Office of Surface Mining began developing a new Stream Buffer Rule in 2009, and initially gave certain States the opportunity to comment on a draft Environmental Impact Statement that would accompany the Rule.

36.     Pursuant to regulations under the National Environmental Policy Act, the Office must "request the participation of each cooperating agency in the NEPA process at the earliest possible time," and "meet with a cooperating agency at the latter's request."  40 C.F.R. §§ 1501.6(a), 1508.5.  Departments from 10 States, including Alabama, Indiana, Kentucky, Montana, New Mexico, Texas, Utah, Virginia, West Virginia, and Wyoming ("The Cooperating State Agencies") became cooperating agencies with regard to the contemplated Rule by entering into memoranda of understanding with the Office.  *See* 40 C.F.R. § 1508.5.  Ohio also became a commenting State, through the Ohio Department of Natural Resources acting in much the same capacity as the other cooperating agencies.  Alaska followed the rulemaking process informally and commented on the draft rule.

37.     The Office soon failed, however, to continue the required cooperation.  After late 2010 and early 2011, when it gave those States the limited opportunity to see and comment on a working draft of the Environmental Impact Statement ("EIS"), the Office's cooperation with the States during the review process ceased.  The Office's disengagement from the cooperating agency process also violated the terms of the memoranda of understanding that the Office entered into with the Cooperating State Agencies.

38.     In response, many States and non-governmental organizations, including the Interstate Mining Compact Commission and the Western Governors' Association, sent letters to the Office of Surface Mining expressing their concerns about its lack of cooperation and failure to allow the States meaningful participation during the phase of commenting on the draft Environmental Impact Statement.  With regard to the Western Governors' Association in particular, the Secretary of the Interior responded by letter on April 15, 2011, and stated that "all cooperating agencies will have an additional opportunity to review and comment on a Preliminary Draft EIS before it is published for review and comment."  The Secretary further stated that he looked "forward to the continued involvement of the WGA member states serving as cooperating agencies in helping [the Office] to make the tough choices necessary to protect our Nation's streams."  Despite these specific commitments by the Secretary, the Office failed to engage the States in the development of the Rule.

39.     In addition, the Cooperating State Agencies sent three joint letters to the Office expressing their concerns with its failure to cooperate.

40.     The first letter, on November 23, 2010, expressed concerns about the quality, completeness, and accuracy of the draft EIS; the constrained timeframes for the submission of comments on the draft EIS chapters; the reconciliation process whereby the Office was supposed

to discuss the comments received from the cooperating agencies; and the need for additional comment on the revised chapters.  The Office responded to this letter on January 24, 2011, making a number of commitments regarding robust participation with the Cooperating State Agencies in the EIS development process.

41.     Shortly thereafter, however, the Office—without explanation—terminated involvement on the draft EIS with the Cooperating State Agencies.  The second letter from the Cooperating State Agencies, on July 3, 2013, requested an opportunity to reengage in the EIS development process and reiterated the States' concerns regarding how the Office would use their comments in the final draft EIS, including an appropriate characterization of their comments and participation.  The Office never responded to this letter.

42.     The Cooperating Agencies sent their third letter to the Office on February 23, 2015, specifically outlining the States' ongoing concerns about the EIS consultation process. They received no response.

43.     It was not until April 2015 that the Office of Surface Mining made a limited effort to communicate with the Cooperating State Agencies on the draft Environmental Impact Statement.  Yet the Office merely provided a general briefing and overview of the draft Environmental Impact Statement process during an Interstate Mining Compact Commission meeting in Baltimore, Maryland.  The Cooperating State Agencies and participating States present at this meeting communicated to the Office's personnel in attendance, including Director Pizarchik, that the meeting did not qualify as "meaningful consultation," but rather a briefing.

44.     As a result of the Office's failure to cooperate and to facilitate State participation in the undertaking, the majority of Cooperating State Agencies eventually declared their intent to terminate their status as cooperating agencies.  Other States, like Wyoming, maintained their

status as Cooperating State Agencies in the (ultimately vain) hope that the Office of Surface Mining would involve them in the process as intended. The Office did not reform its conduct, and proceeded to develop its Rule without meaningfully engaging with the States.

      **B.**     **The Proposed Rule transformed from an amendment to the Stream Buffer Rule to a comprehensive redraft of the Surface Mining Act.**

     45.     On July 27, 2015, the Office published a proposed rule entitled "Stream Protection Rule" ("Proposed Rule") taking up hundreds of pages of the Federal Register and revising nearly the entire regulatory code dedicated to the Surface Mining Act. *See* 80 Fed. Reg. 44,436 (July 27, 2015) (proposing to amend Parts 700, 701, 773, 774, 777, 779, 780, 783, 784, 785, 800, 816, 817, 824, and 827 of title 30 of Code of Federal Regulations).

     46.     Like the 2008 rulemaking, the Proposed Rule was ostensibly planned only to minimize the adverse impacts of coal mining operations on surface water, groundwater, fish, wildlife, and related environmental values, with particular emphasis on streams. But instead of focusing on streams, the Proposed Rule imposed comprehensive regulatory requirements on mine operators and States at all four stages of the mining process: (1) the permit-application stage; (2) the permit-issuance stage; (3) the mining stage; and the (4) post-mining stage.

     47.     Among other things, the Proposed Rule required mine operators to consider in their permit applications and their fish and wildlife protection and enhancement plans not only species *listed* as threatened or endangered, but also species *proposed* for such listings. 80 Fed. Reg. at 44,565, 44,620. The Proposed Rule also required States to follow a one-size-fits-all definition of "material damage to the hydrologic balance outside the permit area." *Id.* at 44,588. It required the state agency with regulatory authority over the Surface Mining Act to enforce Clean Water Act permits, authorizations, and certifications when there is non-compliance by the

applicant or permittee. *Id.* at 44,515.  And it significantly revised the Stream Buffer Rule. *Id.* at 44,610.

**IV.    On December 20, 2016, the Office of Surface Mining issued a Final Rule after failing again to confer adequately with the States.**

**A.    The Office of Surface Mining again shunned the States' participation before issuing the Final Rule.**

48.    Publication of the Proposed Rule aroused great concern both because the substance of the proposal would have a dire impact on coal mining, and because the flawed process that produced the proposal excluded States from developing a balanced, legal approach.

49.     The Office of Surface Mining originally gave the States and other concerned parties less than two months—from July 27 to September 25, 2015—to review and comment on the sweeping Proposed Rule, which had been some six years in the making.  80 Fed. Reg. at 44,435-36.  It then granted a brief extension until October 26, 2015.  Notice of Extension, 80 Fed. Reg. 54,590-01 (Sept. 10, 2015).

50.    Many States, including Ohio, West Virginia, Alaska, and Wyoming, submitted comments, criticisms, and critiques of the Proposed Rule during the limited notice-and-comment period that the Office allowed.  *See, e.g.*, Letter from the Attorneys General of Ohio, West Virginia, and twelve other States to Joseph Pizarchik, Dir., Office of Surface Mining Reclamation and Enforcement (Oct. 26, 2015); Letter from Ohio Department of Natural Resources (October 26, 2015); Letter from Wyoming Department of Environmental Quality (October 23, 2015); Letter from the Alaska Department of Natural Resources (October 23, 2015).

51.    Alarmed by the way in which the process had unfolded, Congress also intervened. Through the Consolidated Appropriations Act of 2016, signed into law by President Obama on

December 18, 2015, Congress by means of a referenced explanatory statement "direct[ed]" the Office of Surface Mining "to provide the States with all technical reports, data, analyses, comments received, and drafts relative to the environmental reviews, [and] draft and final environmental impact statements."  *See* 161 Cong. Rec. H10217 (daily ed. Dec. 17, 2015).  The Act provides that the explanatory statement "shall have the same effect with respect to the allocation of funds and implementation of divisions A through L of this Act as if it were a joint explanatory statement of a committee of conference."  Pub. L. No. 114-113, § 4, 129 Stat. 2242, 2244.

52.     Having worked to ensure that the States would be informed as to the background of the Proposed Rule, Congress further directed the Office of Surface Mining to "meet with any State with primacy during [the rulemaking process] at the request of the State" so as to "reengage State partners in a meaningful manner *before* finalizing the Stream Buffer Zone rule."   161 Cong. Rec. H10217 (daily ed. Dec. 17, 2015) (emphasis added).

53.     States, including Ohio and its Department of Natural Resources, requested the information that Congress had required the Office to produce, and also requested the face-to-face meetings with the Office that Congress directed.  *See, e.g.*, Letter from Lanny E. Erdos, Chief, Ohio Dep't of Natural Res., Div. of Mineral Res. Mgmt., to Joseph Pizarchik, Dir., Office of Surface Mining Reclamation and Enforcement (Apr. 11, 2016).

54.     The Office, however, failed to satisfy these congressional directives.  It failed to provide the States with most of the background information that Congress had ordered it to produce.  Rather, it made available only select reports and documents by uploading certain information to the Internet (in some cases, using links that expired), leaving the States to collect the balance of the information themselves where possible.

55.     Without having provided States with the background information as directed by Congress, the Office was not positioned to engage in productive meetings with the States to overhaul its Proposed Rule so that it served the Surface Mining Act's balanced objectives.

56.      Instead, aside from phone calls, the Office conducted limited "regional" group meetings with States.  To the best of the States' knowledge, the Office conducted few state-specific meetings.

57.     At these meetings, the Office of Surface Mining failed to have sufficient technical staff present for even preliminary discussion on substantive topics.

58.     The Cooperating State Agencies present at one of these meetings again communicated to personnel in attendance, including Director Pizarchik, that the meeting was a mere briefing, and not a meaningful consultation.

59.     By letter of June 6, 2016, Ohio and West Virginia, through their Attorneys General, notified the Office of Surface Mining of its failure to comply with its obligations under the Consolidated Appropriations Act of 2016.  Ohio and West Virginia requested that the Office produce the relevant documentation and afford requesting States the opportunity to discuss individual concerns with appropriate officials at state-specific meetings.  They expressed their hope for the Office's future compliance with the law's informed-consultation requirements before publication of the Final Rule.  The Office did not comply.

60.     By letter dated February 8, 2016, the State of Alaska, Department of Natural Resources, informed Department of the Interior Assistant Secretary Schneider that it had concerns regarding various issues including the impact of the Rule, and stated that discussions with Assistant Secretary Schneider in mid-January focused on concerns with the Rule itself, and not Alaska's concerns and comments that the draft Environmental Impact Statement and draft

Regulatory Impact Analysis ("RIA") treated Alaska as an afterthought. In a letter dated June 3, 2016, Alaska Department of Natural Resources followed up again with Assistant Secretary Schneider, discussing a visit by the Assistant Secretary to Alaska in which Alaska officials attempted to provide constructive feedback regarding the Rule, the RIA, and the EIS. The letter noted that less than 96 hours after Assistant Secretary Schneider's visit, the Rule was forwarded to the Office of Management and Budget.

61.     By letter of July 11, 2016, the Chairman of the House of Representatives Committee on Appropriations, along with fifteen other representatives on the Committee, wrote to the Office of Surface Mining concerning the Office's failure to comply with its obligations under the Consolidated Appropriations Act of 2016 and the National Environmental Policy Act. The committee members noted that the Office had not provided the States with access to all the applicable documents, and that it had declined to respond to state requests for individual meetings. Additionally, the members found that "[b]y uploading materials not previously provided until after the rule was sent to the Office of Information and Regulatory Affairs," the Office had "again precluded state agencies from the ability to review and respond to all available information." Letter from Rep. Harold Rogers and fifteen other Reps. To Joseph Pizarchik, Dir., Office of Surface Mining Reclamation and Enforcement (July 11, 2016). The committee members requested that the Office provide the States with the latest version of the rule, environmental impact statement, and regulatory impact analysis in advance of their publication, combined with a 90-day review period and opportunity for individual state meetings with the Office to discuss the documents. And, based on state suggestions, the members asked the Office to consider re-opening the comment period for the Rule and the related EIS and RIA.

62.     The Office did not do so.  Rather, it rushed to publish the Final Rule (with one day's advanced notice) on December 20, 2016.  It did so after having withheld announcement of final determinations through November 2016.  Publication of the Final Rule came only 35 days after announcement of the related final Environmental Impact Statement.

63.     On December 20, 2016, the Office of Surface Mining published the Final Rule in the Federal Register.  *See* Stream Protection Rule, 81 Fed. Reg. 93,066 (Dec. 20, 2016). Unsurprisingly, given the Office's failure to confer and meet with the States or adequately address their comments, the Final Rule suffers from many fatal flaws.

**B.      The Final Rule's fish and wildlife protection and enhancement requirements exceed the Office's statutory authority.**

64.     The Final Rule requires mine operators to submit extensive fish and wildlife enhancement plans, and requires States to provide this information to the U.S. Fish and Wildlife Service for assessment and to consider that assessment in the permitting process.  *See* 81 Fed. Reg. at 93,324 (to be codified at 30 C.F.R. § 773.15(j)); *id.* at 93,334-36 (to be codified at 30 C.F.R. § 780.16(e)).  Mining operators then must implement the fish and wildlife enhancement measures in the plans.  *See id.*

65.     This aspect of the Rule exceeds the Office of Surface Mining's statutory authority by, among other things, requiring States to provide information on species *proposed* for listing as threatened or endangered to U.S. Fish and Wildlife, and by precluding the States from approving permit applications absent documentation relating to species proposed for listing.  *See id.*  Given the number of species proposed for listing and those that may be proposed in the future, the new requirement greatly expands the analysis for threatened fish and wildlife protection.  The U.S. Fish and Wildlife Service has no regulatory authority under the Surface Mining Act.

66.     Consideration of species "proposed for listing" under the Endangered Species Act is not a requirement for issuance or receipt of a permit under the Act.  *See* 30 U.S.C. § 1260(b) (specifying findings that a primacy State as the regulatory authority must make as requirements for permit approval); *id.* § 1265(a) (referencing "such other requirements as the regulatory authority shall promulgate"); *id.* § 1265(c)(5).  Further still, the Endangered Species Act itself preempts state law only with regard to actual "endangered" or "threatened" species, and does not preempt state law regarding species "proposed for listing."  *See* 16 U.S.C. § 1535(f).  And designation of an endangered or threatened species is accomplished under the Endangered Species Act by promulgation of a formal and final regulation.  *Id.* § 1533.  The Endangered Species Act also requires that the United States cooperate "to the maximum extent practicable with the States."  *Id.* § 1535(a).

67.     The Rule thus violates the Surface Mining Act while also contravening the Endangered Species Act by directing States to act on the basis of unilateral, non-final listing proposals by the federal Fish and Wildlife Service.

68.     Significantly, the Office of Surface Mining attempts to justify its position on this score by arguing that the Endangered Species Act provides "authority to protect species that have been proposed for listing."  81 Fed. Reg. 93,151 (citing 16 U.S.C. § 1536(a)(4)).  That argument is incorrect as applied to the States, for the cited statute is directed exclusively to "[e]ach Federal agency" regarding "any agency action which is likely to jeopardize the continued existence of any species proposed to be listed . . . ."  16 U.S.C. § 1536(a)(4); *cf.* 81 Fed. Reg. at 93,324 (to be codified at 30 C.F.R. 773.15(j)) (Surface Mining Rule at issue here referencing documentation that mining operations "would have no effect on species . . . proposed for listing . . . .").

69.     The flawed justification, however, underscores the degree to which the Office miscomprehends the role of States under the Surface Mining Act:  under the Act, a primacy State is itself the "regulatory authority," but the Office of Surface mining conceives of a primacy State simply as an adjunct of the federal bureaucracy and conflates States with a "Federal agency."

### C.     The Final Rule's new sampling and monitoring requirements unnecessarily impose arbitrary and heavy burdens on the States and mining operators.

70.     The Final Rule substantially increased required data collection, data analysis, and sampling requirements in a number of ways.

71.     *First*, the Final Rule increases the number of water-sampling sites, the number of water samples that are required per site, and the number of water-quality parameters that are assessed per sample by expanding the definition of adjacent area.  *See* 81 Fed. Reg. at 93,320 (to be codified at 30 C.F.R. § 701.5) and 93,339 (to be codified at 30 C.F.R. § 780.21).

72.     *Second*, the Final Rule imposes a requirement that the state regulatory authority require mining applicants/operators to conduct twelve consecutive months of baseline water sampling.  81 Fed. Reg. 93,337 (to be codified at 30 C.F.R. § 780.19) and 93,362 (to be codified at 30 C.F.R. § 784.19).   Such extensive sampling is unnecessary to account for seasonal variations in water quality and water quantity.

73.     *Third*, the Final Rule imposes a requirement that the regulatory authority require water sampling for 27 specific baseline parameters for surface water and 16 parameters for groundwater regardless of local and regional conditions.  81 Fed. Reg. 93,336-37 (to be codified at 30 CFR § 780.19(a)-(c)).   Additionally, for surface water, sampling is required for any additional parameters "identified in any applicable National Pollutant Discharge Elimination System permit, if known at the time of application for the [Surface Mining Act] permit."  81 Fed.

Reg. 93,336 (to be codified at 30 C.F.R. § 780.19(a)).  For many states, like Ohio, this more than doubles the number of sampling parameters.

74.     The increase in the required groundwater and surface water sampling parameters, along with the requirement for 12 consecutive months of baseline sampling, is arbitrary, and results in the mining applicant/operator having to conduct several thousand more parameter analyses over a one-year period.  With sampling required in the mining and post-mining stages, the heavy sampling continues after baseline sampling is completed.  *See* 81 Fed. Reg. at 93,342 (to be codified at 30 C.F.R. § 780.23).  This is not only burdensome to the mining operator, but it is burdensome on the reviewing state regulatory authority.  By imposing such rigid requirements, the Final Rule deprives the state regulatory authority of its due discretion to tailor sampling requirements to local needs and state water quality programs, and to prioritize and allocate its limited resources to meet the demands of reviewing the submitted data.  These burdensome sampling requirements also create uncertainty over when a permit application will be completed because of the uncertainty in how long it will take to collect, review, and approve the baseline data.

**D.     The Final Rule's "cumulative hydrologic impact assessment" requirements and definition of "material damage to the hydrologic balance outside the permit area" exceed the Office's statutory authority.**

75.     A "cumulative hydrologic impact assessment" is part of the permit application and permit application approval process.  *See* 30 U.S.C. § 1260(b)(3).  The regulatory authority must prepare the cumulative hydrologic impact assessment to evaluate the probable impacts of anticipated coal mining on the hydrologic balance in the cumulative impact area.

76.     The Final Rule vastly expands the required content of the cumulative hydrologic impact assessment.  It significantly increases the burdens on the reviewing agency and the

operator, and significantly increases the likelihood that a permit may not be approved or will be significantly delayed due to the heightened requirements.  *See* 81 Fed. Reg. 93,340-41 (to be codified at 30 C.F.R. 7802.21).  Among other things, the Final Rule requires this assessment to illustrate that the mining operations will not cause "material damage to the hydrologic balance outside the permitting area," which the Rule for the first time defines.  81 Fed. Reg. at 93,340 (to be codified at 30 C.F.R. § 780.21(a)(1)).

77.     The Final Rule thus removes the State's flexibility to define "material damage to the hydrologic balance outside the permit area" by imposing a federal definition with rigid nationwide criteria and standards that greatly expand the required analysis.  81 Fed. Reg. 93,109 and 93,322 (to be codified at 30 C.F.R. § 701.5).  The new definition disregards local and regional differences in geology, hydrology, mining, and reclamation, as well as the expertise of the primacy States in implementing their coal programs.  For example, the Final Rule's expanded baseline sampling is required for all mining operations nationwide, and all such parameters must be considered in the material-damage determination.

78.     In addition, the Final Rule requires each approved permit to specify the point at which mining-related impacts would reach the level of material damage through the establishment of inflexible, federally sanctioned "material damage thresholds."  81 Fed. Reg. at 93,340-41 (to be codified at 30 C.F.R. § 780.21(b)(6)).  These new thresholds will effectively require primacy States to rely on federal agencies (not limited to the Office) to determine whether material damage exists.  On top of these "material damage thresholds," moreover, the Final Rule requires the establishment of inflexible, federally sanctioned "evaluation thresholds" to be considered in the cumulative hydrological impact assessment.  *See* 81 Fed. Reg. at 93,341 (to be codified at 30 C.F.R. § 780.21(b)(7).  If the impacts from mining reach these new

"evaluation thresholds," it could require mining operators to take corrective action even though the mining has not reached the level of "material damage" as defined by the "material damage thresholds."  The federal agencies implementing the Clean Water Act and Endangered Species Act must be involved in developing the material-damage thresholds and evaluation thresholds. Primacy States thus can no longer perform their independent discretionary reviews to determine when and whether material damage occurs.

79.     All told, the new standards and criteria imposed by the Final Rule's content requirements for a cumulative hydrologic impact assessment and the Final Rule's definition of "material damage to the hydrologic balance" violate the Surface Mining Act in several ways.

80.     *First*, the Rule's content requirements for a cumulative hydrologic impact assessment violate the Surface Mining Act.  Among other things, the Rule effectively amends the Clean Water Act's method of applying its water quality standards through effluent limitations contained in individual permits.  *See* 33 U.S.C. §§ 1311, 1312, 1318, 1342, 1344; *see also* 33 U.S.C. § 1342(k) (shielding individuals who comply with permit obligations from enforcement actions concerning water quality standards and effluent limitations).  The Rule, for example, attempts to apply water quality standards outside what is contemplated in the Clean Water Act by requiring the State in the cumulative hydrologic impact assessment to determine that the operation will not "cause or contribute to a violation of  applicable water quality standards adopted under the authority of section 303(c) of the Clean Water Act, 33 U.S.C. 1313(c), or other applicable state or tribal water quality standards" in any surface water located outside the permit area.  81 Fed. Reg. at 93,341 (to be codified at 30 C.F.R. § 780.21(b)(9)(i)(A)).

81.     States have jurisdiction over water resource allocation decisions and are responsible for balancing State water needs within the objectives of the Clean Water Act.

Especially in the West, water use is held as a valuable property right, often administered and protected by each State.  The federal government has recognized this and deferred to States for determining and administering water rights.  This deference has been historically important in the West where use and allocation of scarce water resources require evaluations specific to that region.  The Final Rule improperly usurps the States' authority in this area by defining water bodies within a State, the impacts of mining activities on water, and regulating the diversion and storage of water within a State without regard to local conditions or authority.

82.     *Second*, the Rule's definition of "material damage to the hydrologic balance outside the permit area" likewise violates the Surface Mining Act.  The definition displaces the role of the States in the assessment of material damage.  The Act requires the State as "the regulatory authority" to "find[] in writing" that "the proposed operation . . . has been designed to prevent material damage to [the] hydrologic balance outside [the] permit area."   30 U.S.C. § 1260(b)(3).  The Act thus deferred to the States' judgment as the primary regulatory authority about whether an operation has been designed to prevent material damage.  Further, the Act's reasons for preserving the primary role of the States—"the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations," 30 U.S.C. § 1201(f)—are particularly important to the material-damage analysis.  The Rule has removed the State's flexibility to define material damage by imposing a federal definition with rigid nationwide criteria and standards that greatly expand the required analysis.

83.     *Third*, the Rule's material-damage definition also violates the Act by applying the same standard to longwall mining that it applies to surface mining.  The definition of "material damage to the hydrologic balance outside the permit area" includes an "adverse impact . . . resulting from . . . underground mining activities, or subsidence associated with underground

mining activities, on the quality or quantity of surface water or groundwater, or on the biological condition of a perennial or intermittent stream." 81 Fed. Reg. at 93,109 and 93,322 (to be codified at 30 C.F.R. § 701.5). Congress in the Act recognized that underground mining is essential to the national interest and that it is impossible to avoid all subsidence from underground mining. Thus, the Act instructs operators to "adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible . . . except in those instances where the mining technology used requires planned subsidence in a predictable and controlled manner." 30 U.S.C. § 1266(b)(1). The Rule's instruction that underground mine operators must avoid even planned and controlled subsidence violates the Surface Mining Act.

84.     *Fourth*, the definition further violates the Surface Mining Act by making coal mining impossible in vast areas of the country. The Act recognizes that it is "essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry." 30 U.S.C. § 1201(b) and (e).

### E.     The Final Rule's revisions to the Stream Buffer Rule exceed the Office of Surface Mining's statutory authority.

85.     The Final Rule revised the Stream Buffer Rule to preclude mining-related activity in or within 100 feet of a perennial or intermittent stream unless the proposed activity would not: (1) "cause or contribute to a violation of applicable water standards adopted under the authority of section 303(c) of the Clean Water Act, 33 U.S.C. 1313(c) or other applicable state or tribal water quality standards"; (2) "cause material damage to the hydrologic balance outside the permit area"; or (3) "[r]esult in conversion of the affected stream segment from intermittent to ephemeral or from perennial to intermittent; from perennial to ephemeral." 81 Fed. Reg. at 93,348 (to be codified at 30 C.F.R. § 780.28(e)).

86.     The Final Rule also precludes any mining-related activity in or within 100 feet of a perennial or intermittent stream unless the applicant can demonstrate that: (1) "[t]here is no practicable alternative" to "mining through," "diverting," or placing excess spoil or waste in the stream; (2) the applicant has "minimize[d] the extent to which" the stream will be "mined through, diverted or covered"; (3) the proposed reclamation plan will restore "the form, hydrologic function, dynamic near-equilibrium, streamside vegetation, and ecologic function" of the stream; (4) the applicant has "minimize[d] the amount of excess spoil or coal mine waste" and "adverse impacts on fish, wildlife, and related environmental values"; (5) the applicant has a plan to "offset any [such] long-term adverse impacts"; (6) the operation will not create toxic mine drainage; and (7) the revegetation plan requires reforestation if the land would revert to forest under natural succession.  81 Fed. Reg. at 93,348 (to be codified at 30 C.F.R. § 780.28(e)).

87.     The Final Rule relies upon the U.S. EPA's *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (Final Report)* published in 2015.  *See* 81 Fed. Reg. 93,085-86 n.86.  Yet that Report supports utilizing connectivity of water as a scientific basis for even *broader* federal agency jurisdiction under the Clean Water Act than what is suggested under the recently *enjoined* Clean Water Rule.

88.     This revised Stream Buffer Rule violate the Surface Mining Act in many ways.

89.     *First*, Congress found in the Surface Mining Act that "coal mining operations presently contribute significantly to the Nation's energy requirements" and that it is "essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry."  30 U.S.C. § 1201(b).  The Rule ignores this command, and instead, makes mining impossible in vast areas of the country.

90.    *Second*, the Rule prohibits mining activity near streams even if those operations minimize adverse impacts using the best technology currently available.  The Act instructs mine operators to "*minimize* disturbances and adverse impacts . . . on fish, wildlife, and related environmental values . . . to the extent possible using the best technology currently available," 30 U.S.C. § 1265(b)(24) (emphasis added)—not to eliminate them, as the Rule requires.  *See also* 30 U.S.C. § 1201(e).

91.    *Third*, the Rule imposes too strict a standard on excess spoil material.  Yet "it is beyond dispute that [the Surface Mining Act] recognizes the possibility of placing excess spoil material in waters of the United States even though those materials do not have a beneficial purpose."  *Kentuckians for Commonwealth, Inc., v. Riverburgh*, 317 F.3d 425, 443 (4th Cir. 2003) (emphasis omitted).

92.    *Fourth*, the Rule's requirement for the applicant to demonstrate that no perennial stream segment will be converted to intermittent or ephemeral status and that no intermittent stream segment will be converted to ephemeral, is difficult or impossible to meet, since there are factors that cannot be predicted with certainty during the mining operation and backfilling of spoil.  This requirement therefore violates Act's command to recognize the Nation's interest in coal and a healthy underground mining industry.

93.    *Fifth*, to the extent that the Office of Surface Mining purports to promulgate this part of the Rule under the Surface Mining Act at all (as opposed to the authority it claims under the Clean Water Act and the Endangered Species Act, neither of which grants it any regulatory authority), the Office predicates the Rule largely on 30 U.S.C. § 1265.  *See* 81 Fed. Reg. at 93,199-93,219.  For primacy States, however, that statutory section refers again to the State

permitting process and further permits "such other requirements as the regulatory authority [again, the primacy States] shall promulgate."  30 U.S.C. § 1265(a); *see also id.* § 1265(c)(1).

### F. The Final Rule's failure to account for the differences between underground mining and surface mining exceed the Office of Surface Mining's statutory authority.

94.     The Rule will interfere with the growth of longwall mining by creating permit-application requirements that are difficult or impossible to meet.  The Rule effectively requires that permits be denied when longwall mining *might* in some way adversely impact the quantity or quality of surface water or groundwater. The Rule's requirements making it difficult or impossible to mine near streams also have a heavy impact on longwall mining because of the inherent costs and technical issues associated with moving large longwall panels around streams.

95.     As noted above, the Rule also fails to account for the differences between underground mining (including longwall mining) and surface mining that are expressly recognized by the Act.  *Cf.* 30 U.S.C. § 1266(a) (federal regulations directed to the surface effects of underground coal mining "shall consider the distinct difference between surface coal mining and underground coal mining").  It imposes the same onerous requirements on longwall mining as surface mining.

96.     Similarly, the Rule's requirements fail to take into account that the Surface Mining Act expressly allows subsidence from longwall mining, because longwall mining is a technology that *requires* planned subsidence in a predictable and controlled manner.  30 U.S.C. § 1266(b)(1) (permitting system shall require operator to "adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible . . . except in those instances where the mining technology used requires planned subsidence in a predictable and controlled manner").

**G.**     **The Final Rule infringes on the authority of other agencies responsible for regulating the Clean Water Act and requires States to take enforcement action under the Clean Water Act and the Endangered Species Act, all in violation of the Surface Mining Act.**

97.     The Rule duplicates and infringes on the authority of other agencies responsible for regulating the Clean Water Act, including Section 303, 401, 402, and 404 of the Clean Water Act as it relates to the physical, chemical, and biological assessment of perennial and intermittent streams. *See* 81 Fed. Reg. at 93,165-167.

98.     The Rule violates the Act by attempting to add an additional enforcement authority and mechanism to the Clean Water Act even though "[n]othing in [the Surface Mining Act] shall be construed as superseding, amending, modifying, or repealing . . . [t]he Federal Water Pollution Control Act [('Clean Water Act')], the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality." 30 U.S.C. § 1292(a)(3).

99.     Contrary to the text and premise of the Rule, the Surface Mining Act itself does not provide the Office of Surface Mining with overlapping regulatory authority for the Clean Water Act or the Endangered Species Act, and it is not some "Clean Water/Endangered Species/Surface Mining Act" amalgam empowering the Office of Surface Mining to fill perceived gaps in federal policy.

100.     The Office itself previously has acknowledged that the Surface Mining Act "and the Clean Water Act provide for separate regulatory programs with different purposes and very different permitting requirements and procedures." 73 Fed. Reg. at 75,819. Consequently, "maintaining the distinction between the [Surface Mining Act] and Clean Water Act regulatory programs is both administratively and legally appropriate." *Id.* at 75,821. This Rule, however, eviscerates that necessary distinction.

31

101.    In addition, the Final Rule disregards the distinctions that may exist between Clean Water Act regulatory programs in different States by imposing uniform requirements related to water quality issues.  States are the preeminent authority on water management within their boundaries. The States have determined how to apportion their authority to regulate under the Surface Mining Act, the Clean Water Act, and water use among a variety of State regulatory authorities. The Final Rule impermissibly alters how the States perform these functions.

102.    For example, the Final Rule requires monitoring a fixed list of water quality parameters regardless of whether a State's Clean Water Act program would regard those parameters as parameters of concern for the mine.  *See* 81 Fed. Reg. at 93,336-37 (to be codified at 30 C.F.R. § 780.19), 93,342-44 (to be codified at 30 C.F.R. § 780.23), 93,361-62 to be codified at 30 C.F.R. § 784.19), 93,368-70 (to be codified at 30 C.F.R. § 784.23).  By unlawfully charging a State's Surface Mining Act regulatory authority with enforcing the Clean Water Act in its State, the Final Rule creates duplicative and competing enforcement authorities.  And by establishing nationwide specific standards regardless of any distinctions under a State's Clean Water Act program, the Final Rule would place a State's surface mining and water quality regulatory agencies at odds with one another.

**H.    The Final Rule's revegetation and reclamation requirements exceed the Office of Surface Mining's statutory authority.**

103.    The Rule violates the Surface Mining Act by requiring restoration to pre-mining land-use capability rather than adhering to the Act's focus on the post-mining land use.  *See*, *e.g.*, 30 U.S.C. § 1265(b)(2) (operations required to "restore the land affected to a condition capable of supporting the uses which it was capable of supporting prior to any mining, or higher or better uses"); *id.* § 1265(b)(19) ("introduced species may be used in the revegetation process where desirable and necessary to achieve the approved postmining land use plan."); *id.* § 1265(b)(20)

(setting periods of responsibility for revegetation based on postmining land uses); *id.* § 1265(c)(2)-(3) (providing that postmining contouring may be different than premining contouring when it is appropriate for the postmining land use).

104.    The Rule defines reclamation as "those actions taken to restore mined land and associated disturbed areas to a condition in which the site is capable of supporting the uses it was capable of supporting prior to any mining or any higher or better uses approved by the regulatory authority." 81 Fed. Reg. at 93,322 (to be codified at 30 C.F.R. § 701.5).

105.    The definition of reclamation conflicts with the Surface Mining Act's command to balance environmental impacts with the need for an "economically healthy underground coal mining industry." 30 U.S.C. § 1201(b). The Rule requires mine operators to restore land to the uses it was capable of supporting prior to any mining even if the land will be used for a different post-mining use. This is an unnecessary requirement that serves only to make mining no longer economically feasible and it conflicts with the Surface Mining Act's specific allowance of restoring affected lands to a condition capable of supporting approved postmining land uses. *See* 30 U.S.C. § 1265(b)(2). In addition, the Rule sets strict standards for getting approval of alternative postmining land uses that are different from premining land uses. *See, e.g.*, 81 Fed. Reg. at 93,344-45 (to be codified at 30 C.F.R. § 780.24(b)(1)).

106.    The definition of reclamation exceeds the authority of the Surface Mining Act and the U.S. Constitution by infringing on the property rights of landowners, including sovereign States with coal properties.

**V.      The Final Rule harms the States and violates the U.S. Constitution.**

107.    The Rule harms the States in their capacity as the primary regulators of their States' energy supplies. *See Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) (recognizing the States' authority over intrastate generation and consumption of

electricity).  The Rule also significantly diminishes their ability to rely upon coal as an important component in meeting the energy needs of their citizenry, and threatens a reduction in the power available to businesses and citizens.

108.    In addition, the Rule harms the sovereignty of the States by commandeering the States to serve as agents of the federal government.

109.    The Rule, moreover, imposes financial harms on the States by requiring them to adopt the Rule's provisions as part of their state program.  The Rule imposes compliance costs on States and requires them to expend state resources analyzing the Rule as well as writing and implementing regulations.  In addition, the Rule imposes compliance costs to implement rigid, nationwide requirements that ignore local conditions and needs and therefore provide no environmental benefit to the States in exchange for the required additional costs.

110.    Further, the Rule will cause financial harm to the States through the loss of severance tax revenue resulting from the Rule's prohibition on mining in vast areas of the country and the significant regulatory costs imposed on mining operations.  *See* W. Va. Code § 11-12B-3; *Wyoming v. Oklahoma*, 502 U.S. 437, 450 (1992).  The Rule will also cause losses in revenues from ad valorem and sales taxes, as well as less monetary support for Abandoned Mine Lands programs and the Black Lung Fund.  In addition, in States like Wyoming where coal production is derived extensively from federal coal and lands owned by the federal government, the losses of production caused by the Rule would reduce the federal mineral royalty revenue that is returned to States where production occurs, and would also decrease coal lease bonus payments made to the States from new leases.

111.    The Rule further harms States in their capacity of the owners of coal lands and resources.  For Alaska specifically, the financial harm imposed is contrary to the purpose of 30

U.S.C. § 1298 and Section 6 of the Alaska Statehood Act, Public Law 85-508 (providing for selection of lands by the State of Alaska, including mineral deposits).

112.     The States are squarely within the Surface Mining Act's zone of interest, given that Congress instructed the Office of Surface Mining that "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations . . . should rest with the States." 30 U.S.C. § 1201(f).  Contrary to the Surface Mining Act's directive to entrust the States with primary authority given the diversity in physical conditions and other circumstances between the States, the Rule imposes requirements that are far too specific to constitute "minimum standards" and instead resemble the specific implementation decisions that the Surface Mining Act empowers State regulatory authorities to make. *See id.*  By promulgating the Rule, the Agencies violated this protection of the States' authority.

113.     The Final Rule attempts to regulate water uses and impacts beyond the waters of the United States, in violation of the U.S. Constitution.

## CLAIMS FOR RELIEF

## COUNT ONE

### Violation of the Surface Mining Control and Reclamation Act

114.     The States incorporate by reference the allegations of the preceding paragraphs.

115.      Rules must be consistent with their authorizing statutes.  5 U.S.C. § 706(2)(C).

116.     A court does not "presume a delegation of power simply from the absence of an express withholding of power." *Chamber of Commerce of U.S. v. NLRB*, 721 F.3d 152, 160 (4th Cir. 2013).

117.    In the Surface Mining Act, Congress made its allocation of power clear; the States have primary regulatory authority and the Office of Surface Mining has limited oversight authority.  In the Rule, the Office seeks to change this allocation.

118.    If Congress had meant to transform the States' source of significant energy supplies in this way, and to flip the traditional regulatory balance over lands generally and coal mining in particular to replace state responsibility with federal dictate, it would have said so clearly.  *See, e.g.*, *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014).  It did not.

119.    The Rule exceeds the Office of Surface Mining's authority under the Act by, among other things, (1) prohibiting nearly all mining-related activities in or near streams; (2) unlawfully defining "cumulative hydrologic impact assessment" and "material damage to the hydrologic balance outside the permit area"; (3) requiring a material-damage finding for  outside the permit area every three years; (4) imposing fish and wildlife enhancement requirements in excess of statutory authority; (5) duplicating and infringing on the authority of other agencies responsible for regulating the Clean Water Act; (6) imposing revegetation and reclamation requirements in excess of statutory authority; (7) interfering with the growth of longwall mining by creating new permit-application requirements that are difficult or impossible to meet and that regulate underground mining in the same manner as surface mining in excess of statutory authority; (8) imposing regulations that disregard "the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations" that the Surface Mining Act recognizes as forming the basis for primary governmental responsibility resting with the States; and (9) failing to defer to Western States' authority over water use.

120.    The Rule is contrary to the Surface Mining Act's directives to "insure the existence of an expanding and economically healthy underground coal mining industry," 30

U.S.C. § 1201(b), and to "strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy," 30 U.S.C. § 1202(f).

121.     The Rule is contrary to the Surface Mining Act's directive to "consider the distinct difference between surface coal mining and underground coal mining." 30 U.S.C. § 1266(a).

122.     The Rule is contrary to the Surface Mining Act's recognition that longwall mining should be regulated differently from surface mining so as to allow for "planned subsidence in a predictable and controlled manner" instead of prohibiting subsidence. 30 U.S.C. § 1266(b)(1).

123.     The Rule fails to respect the role of the States as primary regulators of mining operations within their borders, and thereby impermissibly interferes with the "extraordinary deference" that the Surface Mining Act accords States to implement and enforce their mining programs as primacy States. *Bragg*, 248 F.3d at 289.

124.     The Rule illegally interferes with and supersedes the Clean Water Act. Congress stated in the Surface Mining Act that "[n]othing in this chapter shall be construed as superseding, amending, modifying, or repealing . . . [the Clean Water Act]." 30 U.S.C. § 1292(a)(3).

## COUNT TWO

**The Rule is Arbitrary and Capricious under the Administrative Procedure Act
and Surface Mining Act**

125.     The States incorporate by reference the allegations of the preceding paragraphs.

126.      Rules cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

127.      The Surface Mining Act also provides that "any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary,

capricious, or otherwise inconsistent with law."   30 U.S.C. § 1276(a)(1).   The agency must provide an internally consistent and satisfactory explanation for its actions.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-27 (2016); *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 854-55 (D.C. Cir. 1987).

128.    Further, when an agency changes its position, it must "display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. . . .  And of course the agency must show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Encino Motorcars*, 136 S. Ct. at 2126.

129.    The Rule is arbitrary and capricious by: (1) prohibiting nearly all mining-related activities in or near streams (2) unlawfully defining "cumulative hydrologic impact assessment" and "material damage to the hydrologic balance outside the permit area"; (3) requiring a material damage finding for outside the permit area every three years; (4) imposing fish and wildlife enhancement requirements in excess of statutory authority; (5) duplicating and infringing on the authority of other agencies responsible for regulating the Clean Water Act;  (6) imposing revegetation and reclamation requirements in excess of statutory authority; (7) interfering with the growth of longwall mining by creating new permit application requirements that are difficult or impossible to meet and that regulate underground mining in the same manner as surface mining; (8) imposing regulations that disregard "the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations" that Surface Mining Act recognizes as forming the basis for primary governmental responsibility resting with the States; and (9) failing to defer to Western States' authority over water use.

38

130.    For example, the Rule arbitrarily departs from the Office of Surface Mining's prior policy without acknowledging that it has changed its position and without providing a reasoned explanation for the change.  In 2008, the Office decided not to prohibit placement of *all* coal mine waste in or within 100 feet of streams because "there is sometimes no viable alternative to the construction of coal mine waste disposal facilities in perennial or intermittent streams and their buffer zones, in which case avoidance is not reasonably possible."  73 Fed. Reg. 75,833.  The Office has not explained its reasons for changing course in the Final Rule or what viable alternative has become available since 2008.  The Office has also arbitrarily changed course on the need for a federal definition of material damage to the hydrologic balance outside the permit area.  *Compare* 48 Fed. Reg. 43,973, *with* 73 Fed. Reg. 78,977.

131.    In several areas the Rule arbitrarily imposes the same regulatory requirements on underground coal mining operations that it imposes on surface mining operations despite the Act's instruction to "consider the distinct difference between surface coal mining and underground coal mining."  30 U.S.C. § 1266(a).

132.    In certain areas, moreover, the Rule arbitrarily imposes more burdensome requirements on underground mine operators despite the Act's instruction to "insure the existence of an expanding and economically healthy underground coal mining industry."  30 U.S.C. § 1201(b).

133.    The Rule is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.§ 706(2)(A).

## COUNT THREE

**The Rule renders the Surface Mining Control and Reclamation Act in excess of Congress's enumerated powers**

134.    The States incorporate by reference the allegations of the preceding paragraphs.

135.     The Constitution grants to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art I, § 8, cl. 3.

136.     Justice Rehnquist, concurring in the judgment in *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.*, 452 U.S. 264 (1981), explained that "there can be no doubt that Congress in regulating surface mining has stretched its authority to the 'nth degree.'" *Id.* at 311 (Rehnquist, J., concurring in judgment).  This Rule seeks to stretch that authority well beyond what the *Hodel* Court contemplated.

137.     The Office of Surface Mining's interpretation of the Surface Mining Act through the Rule goes beyond the outer bounds not only of the statute that Congress enacted but of Congress's constitutional authority.

138.     The Supreme Court has explained that courts will not "lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  An agency interpretation of a statute that would cause the statute to extend to the outer limits of Congress's constitutional authority is impermissible, unless Congress clearly expressed such an intention.  *Id.*

139.     The Rule exceeds Congress's authority under the Constitution by (1) prohibiting nearly all mining-related activities in or near streams (2) unlawfully defining cumulative hydrologic impact assessment and material damage to the hydrologic balance outside the permit area; (3) requiring a material damage finding for outside the permit area every three years; (4) imposing fish and wildlife enhancement requirements in excess of statutory authority; (5) duplicating and infringing on the authority of other agencies responsible for regulating the Clean Water Act; (6) imposing revegetation and reclamation requirements in excess of statutory

40

authority; (7) interfering with the growth of longwall mining by creating new permit application requirements that are difficult or impossible to meet and that regulate underground mining in the same manner as surface mining in excess of statutory authority; (8) imposing regulations that disregard "the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations" that Surface Mining Act recognizes as forming the basis for primary governmental responsibility resting with the States; and (9) failing to defer to Western States' authority over water use.

140.    The Rule renders the Surface Mining Act in excess of Congress' authority under the Commerce Clause.  Accordingly, the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## COUNT FOUR

### Violation of State Sovereignty under the Tenth Amendment

141.    The States incorporate by reference the allegations of the preceding paragraphs.

142.    Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

143.    One of the powers reserved to the States by the Tenth Amendment is the regulation of land-use management, which is "a function traditionally performed by local governments."  *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994).

144.    Congress expressed its intention to preserve this authority in the Surface Mining Act by granting States "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations.  30 U.S.C. § 1201(f).

145. The Tenth Amendment confirms that the federal government may not commandeer the States to carry out federal law—that is, it may not "use the States as implements of regulation." *New York v. United States*, 505 U.S. 144, 161 (1992); *see also Printz v. United States*, 521 U.S. 898, 933 (1997).

146. Similarly, the federal government cannot coerce States into implementing federal policy by leveraging a substantial existing entitlement of the State or its citizens. *NFIB v. Sebelius*, 132 S. Ct. 2566, 2603-04 (2012).

147. The Rule unconstitutionally offers the States a choice between allowing the Office of Surface Mining to restructure their surface coal mining economy and implementing federal policy. The Office has unlawfully leveraged the States' existing entitlement—their constitutionally reserved and statutorily protected authority over land use management and mining regulation—to coerce the States into implementing a federal program.

## COUNT FIVE

### Violation of the National Environmental Policy Act

148. The States incorporate by reference the allegations of the preceding paragraphs.

149. The Office of Surface Mining failed to engage in meaningful cooperation with state agencies as required by regulations governing rulemakings subject to the National Environmental Policy Act (NEPA). 40 C.F.R. §§ 1501.6, 1508.5.

150. The regulations require the agency to "[r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time" and to "meet with a cooperating agency at the latter's request." 40 C.F.R. §§ 1501.6(a). By agreement, state agencies may become cooperating agencies, and agencies from 11 States did so with respect to the Proposed Rule. 40 C.F.R. § 1508.5.

42

151.    The States were deprived of the meaningful engagement required by NEPA, including those States that remained cooperating agencies throughout the entire rulemaking process.

152.    The EIS improperly lumps varied geographic areas together for analysis and is arbitrary and capricious.

153.    Accordingly, the Rule was not promulgated in accordance with law.

## COUNT SIX

### Violation of the Consolidated Appropriations Act of 2016

154.    The States incorporate by reference the allegations of the preceding paragraphs.

155.    On December 18, 2015, the President signed into law the Consolidated Appropriations Act of 2016.   The Act incorporated by reference an explanatory statement, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, §4, 129 Stat. 2242, 2244 (2015), "direct[ing] [the Office of Surface Mining] to provide the States with all technical reports, data, analyses, comments received, and drafts relative to the environmental reviews, [and to] draft and final environmental impact statements," 161 Cong. Rec. H10217 (2015).

156.    The statement also directed the Office of Surface Mining to  "meet with any State with primacy during [the rulemaking process] at the request of the State" to "reengage State partners in a meaningful manner before finalizing the Stream Buffer Zone rule."  *Id.*  The statement is incorporated by reference into the Act and constitutes a binding legal requirement on the Office.

157.    The Office of Surface Mining did not satisfy the directives of the Consolidated Appropriations Act.

158.    The Office of Surface Mining did not comply with the congressional mandate to provide States with all reports, data, analyses, comments, and drafts used in formulating the rule. And the Office did not conduct the meetings required with the States.  The Office failed to properly engage the States for meaningful participation to write a rule consistent with Surface Mining Act's "extraordinary deference to the States."

159.    The States were deprived of the opportunity to meaningfully engage with the Office on the Proposed Rule as required by the Consolidated Appropriations Act of 2016.

160.    Accordingly, the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## COUNT SEVEN

### Claim for Injunctive Relief

161.    The States incorporate by reference the allegations of the preceding paragraphs.

162.    A plaintiff must satisfy a four-factor test before a court will grant injunctive relief: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

163.    Under the Surface Mining Act, moreover, this Court may "grant such temporary relief as it deems appropriate pending final determination of the proceedings" if:  all parties have been notified and given an opportunity to be heard; the States show that there is a substantial likelihood that they will prevail on the merits of the final determination; and such relief will not adversely affect the public health or safety or cause significant imminent environmental harm. 30 U.S.C. § 1276(c).

164.    An injunction is warranted and would serve the public interest because the Rule impairs the States' ability to protect land and water resources in accordance with local needs; threatens the existence of an industry Congress found "essential to the national interest," 30 U.S.C. § 1201(b); imposes significant costs on States, businesses, and citizens without comparable environmental benefits received in return; and introduces uncertainty by duplicating the efforts of other federal regulators.

165.    The States and their citizens also will be irreparably injured by the Rule.

166.    The Rule harms the States and their citizens by transferring regulatory authority to the federal government.  The statutory and constitutional limitations on the authority of federal agencies protect citizens from the intrusion of the federal government into areas where local knowledge is critical to designing effective rules and policies.  As the Surface Mining Act recognized, the regulation of mining is such an area.  By displacing local regulatory authority, the Rule impedes, rather than advances, efforts to balance the importance of coal to the nation's economy with environmental considerations.

167.    The Rule also imposes compliance costs on the States that cannot be recovered even if the Rule ultimately is held invalid, due to the federal government's sovereign immunity. The Rule requires States to adopt regulations and potentially legislation to comply with the Rule, imposing compliance costs on the States.  If the Rule is held invalid, these illegal compliance costs are unrecoverable.  "'[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'"  *Texas v. U.S. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)).

45

168.   The Rule imposes many harms specifically on citizens because the Rule will cause a decline in coal production.   The Rule, among other things, makes mining impossible in vast areas of the country by (1) prohibiting mining activities within 100 feet of broadly defined streams, even if it is not reasonably possible to avoid those activities, and (2) unlawfully defining "material damage to the hydrologic balance outside the permit area" and expanding the scope of a "cumulative hydrologic impact assessment" for a "material damage" determination.   The Rule also imposes other burdensome regulatory requirements.

169.   The Office of Surface Mining has been in the process of developing this Rule for approximately six years, and that time shows that maintenance of the status quo pending a full merits review will not imperil the public health.

170.   Holding executive agencies to the rule of law and confirming the basic tenet that "Congress' inability or unwillingness to pass a law desired by the executive branch does not default authority to the executive branch to act independently," *Wyoming v. U.S. Dep't of Interior*, Nos. 2:15-CV-043-SWS, 2:15-CV-041-SWS, 2016 WL 3509415, at *12 (D. Wyo. June 21, 2016) (holding agency lacked authority to issue fracking regulations at issue and setting final rule aside as contrary to law), serves the public's vital interest in preserving our constitutional order.

171.   The States are therefore entitled to injunctive relief under 5 U.S.C. § 702 and 30 U.S.C. § 1276(c).

## COUNT EIGHT

### Claim for Declaratory Relief

172.   The States incorporate by reference the allegations of the preceding paragraphs.

173.    Upon the filing of an appropriate pleading, the Court may enter declaratory and injunctive relief to any interested party.  28 U.S.C. §§ 2201-2202; 5 U.S.C. §§ 701-706.

174.    An actual and substantial controversy exists between the States and Defendants over the legality of the Final Rule.  In enacting the Rule, Defendants violated the Administrative Procedure Act, the National Environmental Policy Act, the Consolidated Appropriations Act of 2016, the Surface Mining Control and Reclamation Act, and the U.S. Constitution.

175.     The Rule is arbitrary and capricious, unlawful, and unconstitutional.

176.    Pursuant to 28 U.S.C. §§ 2201-2202 and to 5 U.S.C. §§ 701-706, the States are entitled to declaratory and injunctive relief finding that the Rule is invalid.

## PRAYER FOR RELIEF

A.    Declaring that the Rule is unlawful because it: (1) violates the Surface Mining Act; (2) is arbitrary and capricious in violation of the Administrative Procedure Act; (3) exceeds Congress's powers under the Commerce Clause; (4) interferes with state sovereignty in violation of the Tenth Amendment; (5) was promulgated in violation of the National Environmental Policy Act; and (6) was adopted in violation of the Consolidated Appropriations Act of 2016;

B.    Vacating and setting aside the Rule in its entirety;

C.    Issuing preliminary and permanent injunctive relief prohibiting the Agencies from using, applying, enforcing, or otherwise proceeding on the basis of the Rule;

D.    Remanding this case to the Department of Interior and Office of Surface Mining, to permit the Agencies to issue a rule that complies with the Surface Mining Act, the Administrative Procedure Act, the U.S. Constitution, the National Environmental Policy Act, and the congressional directives in the Consolidated Appropriations Act of 2016;

E.    Awarding the States costs and attorneys' fees pursuant to any applicable statute or authority; and

F.      Awarding the States such additional relief, including equitable injunctive relief, as

the Court deems appropriate.

Respectfully submitted,


*/s/ Elbert Lin*
PATRICK MORRISEY
  *Attorney General of West Virginia*
Elbert Lin
  *Solicitor General*
Erica N. Peterson
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, WV  25305
(304) 558-2021
Elbert.Lin@wvago.gov
  *Counsel for State of West Virginia*


*/s/ Robert D. Tambling*
LUTHER STRANGE
  *Attorney General of Alabama*
Robert D. Tambling
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue,
Montgomery, AL  36130
(334) 242-7445
rtambling@ago.state.al.us
  *Counsel for State of Alabama*


*/s/ Lee Rudofsky*
LESLIE RUTLEDGE
  *Attorney General of Arkansas*
Lee Rudofsky
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR  72201
(501) 682-2007
lee.rudofsky@arkansasag.gov
  *Counsel for State of Arkansas*


*/s/ Eric E. Murphy*
MICHAEL DEWINE
  *Attorney General of Ohio*
Eric E. Murphy
  *State Solicitor*
Brett A. Kravitz
  *Senior Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
30 East Broad Street, 17th Floor
Columbus, OH  43215
(614) 466-8980
eric.murphy@ohioattorneygeneral.gov
  *Counsel for State of Ohio*


*/s/ Ashley C. Brown*
JAHNA LINDEMUTH
  *Attorney General of Alaska*
Ashley C. Brown
  *Assistant Attorney General*
Alaska Department of Law
OFFICE OF THE ATTORNEY GENERAL
1031 West 4th Avenue, Suite 200
Anchorage, AK  99501
(907) 269-5232
ashley.brown@alaska.gov
  *Counsel for State of Alaska*


*/s/Glenn E. Roper*
CYNTHIA H. COFFMAN
  *Attorney General of Colorado*
Glenn E. Roper
  *Deputy Solicitor General*
Colorado Department of Law
1300 Broadway
10th Floor
Denver, CO  80203
(720) 508-6562
glenn.roper@coag.gov
  *Counsel for State of Colorado*

/s/ Thomas M. Fisher
CURTIS T. HILL, JR.
  *Attorney General of Indiana*
Thomas M. Fisher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA
302 West Washington Street
Indiana Government Center South, Fifth Floor
Indianapolis, IN 46204
(317) 232-6255
tom.fisher@atg.in.gov
  *Counsel for State of Indiana*

/s/ Jeffrey J. Harmon
JEFFREY J. HARMON
  *Deputy General Counsel*
J. Michael West
  *Assistant General Counsel*
KENTUCKY ENERGY AND ENVIRONMENT
CABINET OFFICE OF GENERAL COUNSEL
300 Sower Blvd., 3rd Floor
Frankfort, KY 40601
(502) 782-6966
JeffJ.Harmon@ky.gov
  *Counsel for Kentucky Energy and
  Environment Cabinet*

/s/ Tommy H. Butler
TIMOTHY C. FOX
  *Attorney General of Montana*
Alan L. Joscelyn
  *Chief Deputy Attorney General*
Tommy H. Butler
  *Deputy Attorney General*
MONTANA DEPT. OF JUSTICE
215 North Sanders
Post Office Box 201401
Helena, MT 59620-1401
(406) 444-0662
timothyfox@mt.gov
alanjoscelyn@mt.gov
tommybutler@mt.gov
  *Counsel for State of Montana*

/s/ Joseph A. Newberg, II
Andy Beshear
  *Attorney General of Kentucky*
Joseph A. Newberg, II
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5650
Joe.newberg@ky.gov
  *Counsel for Commonwealth of
  Kentucky*

/s/ D. John Sauer
JOSHUA D. HAWLEY
  *Attorney General of Missouri*
D. John Sauer
  *State Solicitor*
MISSOURI ATTORNEY GENERAL'S OFFICE
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-3321
John.Sauer@ago.mo.gov
  *Counsel for State of Missouri*

/s/ David Austin R. Nimocks
KEN PAXTON
  *Attorney General of Texas*
David Austin R. Nimocks
*Associate Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
(512) 936-1414
Austin.Nimocks@oag.texas.gov
  *Counsel for State of Texas*

/s/ Tyler R. Green                          /s/ Erik Petersen
SEAN D. REYES                               PETER K. MICHAEL
  *Utah Attorney General*                *Attorney General of Wyoming*
Tyler R. Green                              Erik Petersen
  *Utah Solicitor General*               *Senior Assistant Attorney General*
Parker Douglas                              WYOMING ATTORNEY GENERAL'S OFFICE
  *Chief Federal Deputy*               2320 Capitol Ave.
350 North State Street, #230                Cheyenne, WY  82002
P.O. Box 142320                             (307) 777-6946
Salt Lake City, UT  84114-2320              erik.petersen@wyo.gov
(801) 538-9600                                *Counsel for State of Wyoming*
tylergreen@utah.gov
  *Counsel for State of Utah*